UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DIE-MENSION CORPORATION, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:14-CV-392 |
| Plaintiff, | |
| v. | |
| DUN & BRADSTREET CREDIBILITY CORPORATION; DUN & BRADSTREET CORPORATION; and DUN & BRADSTREET, INC., | **CLASS ACTION COMPLAINT** **WITH JURY DEMAND** |
| Defendants. | |

Now comes plaintiff Die-Mension Corporation ("Plaintiff" or "DMC"), individually and on behalf of all others similarly situated, through counsel, and for its complaint against defendants Dun & Bradstreet Credibility Corporation ("DBCC"), and Dun & Bradstreet Corporation and Dun & Bradstreet, Inc. (collectively, "D&B"), states and alleges as follows:

**<u>INTRODUCTION</u>**

1.      Small businesses are the heart of this nation's economy. Access to credit is the lifeblood of small businesses. D&B is the most powerful and prominent reporter on small business credit. Thus, the truthfulness and accuracy of a small business's D&B credit profile, ratings, and scores are of critical concern to the continued health of the small business.

2.     This class action seeks to remedy the efforts by D&B and DBCC, a marketing and sales company cloaked as "Dun & Bradstreet," to wrongfully exploit information, often false and inaccurate, on D&B's reports to sell expensive internet-based credit-on-self products ("CreditBuilder").

3.     D&B publishes *false and inaccurate information* on a swath of small business credit reports.  D&B then sends to DBCC a list of all these changes.  DBCC, in turn, solicits the target small businesses, through cold-calling and form correspondence, to purchase CreditBuilder based on the false credit information as well as through deceptive and misleading statements which confuse reasonable persons regarding the affiliation of D&B to DBCC and to CreditBuilder.  Both D&B and DBCC profit directly from each sale of CreditBuilder.

## PARTIES & JURISDICTION

4.     Plaintiff DMC (the "named plaintiff") is an Ohio corporation with its principal place of business at 3020 Nationwide Parkway in Brunswick, Ohio 44212.  DMC is an absent member of the putative class in the case of *O&R Constr., LLC v. Dun & Bradstreet Credibility Corp.*, *et al.*, No. 2:12-cv-02184-TSZ, which is now pending in the United States District Court for the Western District of Washington before Judge Thomas S. Zilly.  As such, the statutes of limitations applicable to the claims brought here by DMC are tolled pursuant to *Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St. 3d 380 (2002).

5.     Defendant DBCC is a Delaware limited liability company with its principal place of business at 22761 Pacific Coast Highway in Malibu, California 90265.  At all relevant times, DBCC marketed, solicited, and sold CreditBuilder products in the stream of interstate commerce throughout the country, including the state of Ohio and this judicial district.  As such, the exercise of personal jurisdiction by this Court over this defendant is fair and appropriate.

6.     Defendants D&B are publicly-traded Delaware corporations with their principal places of business at 103 John F. Kennedy Parkway in Short Hills, New Jersey 07078.  At all relevant times, D&B licensed, distributed, sold, and published small business credit reports

throughout the country, including the state of Ohio and this judicial district.  As such, the exercise of personal jurisdiction by this Court over these defendants is fair and appropriate.

7.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2), because the matter in controversy (exclusive of interest and costs) exceeds the sum or $5,000,000, and this case is a class action in which the members of the class of plaintiffs are citizens of states different from those of the defendants.  Furthermore, many of the class members reside in states other than the states in which the defendants are domiciled.

8.     This Court is a proper venue pursuant to 28 U.S.C. §1391 because many of the acts and transactions giving rise to this action occurred in this judicial district, the defendants have intentionally availed themselves of this market, and they conduct substantial business here.

## FACTUAL ALLEGATIONS

**THE POWER OF "DUN & BRADSTREET"**

9.     The Dun & Bradstreet name has been synonymous with small business credit for over 150 years.  D&B purports to gather information about small businesses from various sources, including public records, payment or trade experience information supplied by vendors, lenders, and other reporting entities, and data reported to D&B by the small businesses themselves.  D&B maintains databases of information about the credit-worthiness of millions of businesses, and D&B assigns various scores to each small business relating to credit-worthiness. D&B then licenses its credit reports to others for use in making business and credit decisions.

10.     Dun & Bradstreet occupies a unique institutional role in American and international business and D&B has a virtual monopoly over small business credit reporting. Dun & Bradstreet carries the imprimatur of the federal government, which requires a small business to have a D&B-assigned Data Universal Number System ("DUNS") number in order to apply to do work on a government contract.  (A DUNS number is a unique ID recognized, recommended, and often required by global corporations, governments, industry and trade associations.  They are similar to federal tax ID numbers, but only D&B distributes DUNS

numbers.  When applying for credit, loans, or government bids, small businesses must submit a DUNS number, which vendors or others use to pull financial and credit information.)

11.     Given the age, size, reputation, and unique importance attached to "Dun & Bradstreet" and D&B's profiles, reports, scores, and ratings, small businesses are understandably sensitive to negative information on their reports or profiles, reductions in their scores and ratings, and alerts regarding their D&B information.

**DUN & BRADSTREET'S CREDIT-ON-SELF LINE OF BUSINESS**

12.     Some years ago, D&B sought to capitalize on the importance given to its reports and small businesses' concerns about monitoring and improving their credit profile.  It developed an internet-based credit-on-self product called Self Awareness Solutions ("SAS"), which was supposed to provide customers with an opportunity to monitor their reports, dispute inaccurate information in their reports, and submit positive information to help improve their scores and ratings.

13.     Although the SAS line of business was profitable, by April 2009, customer criticism had become so vocal that D&B planned "killing off" the products because customer complaints were driving down its internal "Voice of the Customer" score, and dissatisfaction with the products was resulting in high rates of customer attrition.  Customers complained that D&B was using "high-pressure, bait-and-switch tactics" to sell SAS products, and that the products did not perform as promised.

14.     In order to avoid further scrutiny and litigation over the SAS products – but while continuing to reap profits from the credit-on-self line of business – D&B transferred the rights to sell the product line (which was re-named "CreditBuilder") to a new company, DBCC, in August 2010, for $10 million in cash and annual royalties; a deal estimated at $100 million.

**DBCC DRESSES ITSELF UP AS "DUN & BRADSTREET"**

15.     D&B granted to DBCC a unique license to use the Dun & Bradstreet name, brand, logo, and trade dress.  DBCC employs these elements, as well as email and website addresses

4

that are similar to D&B email and website addresses: http://www.dandb.com and http://www.dnb.com

 

16.     Although DBCC was created in August 2010, it represents to potential customers that it "help[s] businesses establish their credit with a D&B DUNS number," and that it offers "D&B solutions."  It describes its sales force (which it calls "credit advisors") as "modern day Credit Reporters."

17.     DBCC describes itself as a component of D&B's "legacy" and "another chapter in its long and storied history."  DBCC represents to potential customers that its "roots can be traced back to the beginning of the credit industry."  DBCC further represents: "For over 170 years, millions of businesses have relied on these credit services to pave their path to business success.  By 2010, Dun & Bradstreet Credibility Corp. launched a new chapter in this storied history as the company began to offer products to help businesses monitor, manage and build their credit and credibility.  In that respect, we consider Dun & Bradstreet Credibility Corp. a '175 year-old startup.'"

18.     DBCC's ███████████ materials repeatedly emphasize the importance of the "Dun & Bradstreet Brand" and the positioning of the company as a part of the D&B legacy.

19.     DBCC represents to potential customers that they should "Protect Your Business Credit with Dun & Bradstreet Credibility – Search Our Database of Over 29 Million Businesses Now."  The database referred to is the D&B database.

20.     DBCC uses marketing materials which bear both a DBCC logo and a D&B logo and makes no distinction between the companies.  Indeed, one form solicitation contains a title

about the "D&B iUpdate" website and then positions the CreditBuilder product in the second half of the page.

21.     DBCC represents to potential customers that "[a]t D&B Credibility Corp., we make over 1.5 million updates to our database on a daily basis.  It could be major transactions like paying vendors or making lease or mortgage payments, but it could also be seemingly smaller transactions like equipment leasing, advertising, shipping packages or underwriting insurance. . . .  With all this information flooding into D&B, it's critical that you keep on top of your profile and credit score to help ensure you keep your reputation solid . . . . "  D&B makes these updates to its databases, not DBCC.

22.     DBCC █████████████████████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████ (DS Status means that the company does not have a DUNS number.) ████████████████████████████████████████████ ███████████████████████████████████████████ D&B is the entity that gives these scores and ratings, not DBCC.

23.     ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████ D&B is the entity that has these commercial credit profiles, not DBCC.

24.     DBCC ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███ D&B is the entity that sends out commercial credit reports, not DBCC.

25.     DBCC ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████  D&B carries out this validation process, not DBCC.

26.     At bottom, DBCC makes representations which confuse, mislead, deceive, or outright misrepresent the affiliation of DBCC to D&B and the affiliation of CreditBuilder to D&B.  DBCC fails to disclose the nature of the relationship between DBCC and D&B and the relationship between CreditBuilder and D&B.  In sum, DBCC misleads potential customers with deceptive misrepresentations or omissions which conflate DBCC with D&B or "Dun & Bradstreet" and position CreditBuilder as bearing the sponsorship or approval of D&B or "Dun & Bradstreet."

## D&B PLACES FALSE INFORMATION ON CREDIT REPORTS TO FOSTER DBCC'S SALES OF CREDITBUILDER

27.     One of D&B's credit scores is called the Supplier Evaluation Risk ("SER") Rating, which purports to evaluate the risk to a supplier of doing business with the subject small business.  Many large government agencies (*e.g.*, the U.S. Department of Veterans Affairs) and corporations (*e.g.*, Wal-Mart Stores, Inc. ("Wal-Mart")) require that a small business maintain a certain SER Rating to do business with them.  (The SER Rating is an integer ranging from 1 to 9, with 1 being the lowest risk and 9 being the highest risk.  Wal-Mart, for example, requires a small business to have an SER Rating of, at most, 6.)

28.     D&B artificially raises the SER Ratings of a swath of small businesses, assigning them a rating of 7-9, which indicates "high risk of financial stress," despite the fact that D&B has no basis whatsoever to identify a small business as being so close to financial collapse.  D&B then submits – through a batch communication computer program – these artificial changes in the SER Rating to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to the change in SER Rating, DBCC solicits the swath of small businesses to purchase the product to enable them to improve their SER Rating.

29.     Another one of D&B's scores is called the PAYDEX® Score, which purports to reflect the payment history of a small business and its current re-payment capabilities, as

reported by its business associates.  D&B claims it must have at least three reports of trade experiences by a subject small business's associates to prepare a PAYDEX® Score.

30.    D&B issues inaccurate PAYDEX® Scores because it fails to keep accurate and current records of the current re-payment capabilities of swaths of small businesses.  Also, for swaths of small businesses about whom D&B only had two reports of trade experiences, D&B manufactures a third fictitious trade experience so that it can give the subject small business a PAYDEX® Score.  In both cases, D&B transmits via batch computer communication these inaccurate changes to the PAYDEX® Scores to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a low or inaccurate PAYDEX® Score, DBCC solicits the swath of small businesses to purchase the product to enable them to improve their PAYDEX® Score.

31.    Another one of D&B's scores is called the Commercial Credit Score, which purports to represent the likelihood of a small business falling delinquent in its payments to its business associates within the next 12 months.

32.    D&B issues inaccurate Commercial Credit Scores because it fails to keep current records of the current financial outlook of swaths of small businesses.  D&B submits the inaccurate Commercial Credit Scores to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a low or inaccurate Commercial Credit Score, DBCC solicits the swath of small businesses to purchase the product to enable them to improve their Commercial Credit Score.

33.    D&B also enters false negative payment experiences on the credit reports of swaths of small businesses.  These entries include "slow pay" entries (that a small business did not pay its bills or service its debts within industry time-frames), "delinquency" entries (that a small business was delinquent in a payment), and "cash account" entries (that a small business was on a cash-basis with a certain vendor).  D&B submits the entries of these false negative payment experiences to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a negative payment experience, DBCC solicits the swath

8

of small businesses and offers CreditBuilder as the way to "repair" the small businesses' credit report.

34.    D&B also enters fictitious "inquiries" and "complaints" into the profiles of swaths of small businesses.  (An "inquiry" means an entity has pulled D&B's report about a small business.  A "complaint" means a small business's customer has lodged a complaint with D&B.)  D&B submits the entries of fictitious inquiries and complaints to DBCC.  Then, as part of a marketing and sales campaign designed to position CreditBuilder as the solution to a negative payment experience, DBCC solicits the swath of small businesses.

35.    Prior to the annual renewal date of a CreditBuilder customer's subscription to the product, D&B manipulates the customer's credit profile in one or more of the foregoing ways to enable DBCC to solicit the customer for renewal.

36.    D&B profits off the sale of each individual CreditBuilder product.

**PLAINTIFF DMC'S EXPERIENCE**

37.    DMC was founded in 1986.  It manufactures dies and metal stampings.  As part of its business, DMC bids for jobs and performs work on government contracts.  Therefore, DMC acquired a DUNS number in 2002, and its D&B report is of critical importance to the company's business.

38.    Karen Thompson has been President of DMC since 2004.  On February 21, 2012, Ms. Thompson received an unsolicited form letter bearing the "Dun & Bradstreet" logo, which was addressed to DMC by its DUNS number.  The letter bore the heading "Business Credit Notification" and it stated that DMC now had an SER Rating of 7-9 and explained that this rating "demonstrates the highest risk" of a business experiencing "financial stress over the next 12 months."  The letter offered CreditBuilder as the solution to "positively impact [DMC's] scores and ratings."

39.    Prior to sending the February 21, 2012 letter, D&B had manipulated DMC's SER Rating, PAYDEX® Score, and Financial Stress score, published the foregoing false information

on DMC's credit report, and had provided that information to DBCC to use as part of a marketing campaign.

40.     After receiving the February 21, 2012 "Business Credit Notification" letter, Ms. Thompson called DBCC the same day and was told by a DBCC representative that DMC's SER Rating was in the 7-9 range because two "suppliers" had reported to D&B that DMC had made a late payment.   Ms. Thompson was also told that there were negative payment experiences such as "slow pay" entries on DMC's report with D&B, which Ms. Thompson attempted to dispute.   The "slow pay" reports were false and none of DMC's suppliers or vendors had made any such reports.   Had any such "slow pay" or other "negative payment experience" reports been made, due diligence on D&B's part would have determined that the reports were false and should not have been included on DMC's credit profile, nor used as a basis for affecting DMC's scores and ratings.   Ms. Thompson disputed the poor credit rating and demanded that DBCC disclose the identity of the suppliers allegedly reporting the late payment as this information was false.   Despite Ms. Thompson's requests, D&B refused to disclose the identity of the suppliers making the alleged late payment reports and refused to address DMC's SER Rating.

41.     On February 21, 2012, Ms. Thompson was then directed to a D&B customer response team member, Arvy Jane Pile, regarding the false information on DMC's report. Ms. Pile initiated a "trade experience recheck."   A few days later, a D&B team member told Ms. Thompson that the false information had been "removed" from DMC's report.

42.     Thereafter, on February 23, 2012 and March 2, 2012, DMC received emails from D&B which stated that D&B verified negative payment experiences which reported that DMC allegedly demonstrated "slow pay" habits to various suppliers on bills ranging from $50 to $100. Once again, these items were false and none of DMC's business associates had made any such reports.

43.     On March 13, 2012, DMC received another "Business Credit Notification" letter from D&B which stated that, according to D&B records, DMC experienced the following

activity: "Low PAYDEX® score change."  Again, the letter requested that DMC call DBCC's credit advisor and offered CreditBuilder as the solution to improving DMC's scores with D&B.

44.     DMC also received a third "Business Credit Notification" letter which reiterated that DMC had an SER Rating of 7-9, which demonstrated the "highest risk of financial stress," but was demonstrably false.  The letter again advised DMC to contact a DBCC credit advisor to address the situation and to update DMC's record.

45.     Prior to the sending of these letters, D&B had manipulated DMC's SER Rating, PAYDEX® Score, and Financial Stress score and had provided that information to DBCC to use as part of a marketing campaign.

46.     DMC had not changed in any material respects its payment practices, payment performances, or payment experiences which would have warranted a change in its PAYDEX® Score or SER Rating.

47.     Throughout her dealings with D&B, Ms. Thompson repeatedly asked for the source of the false information, but D&B refused to release any information.

48.     By April 2, 2012, DMC believed it had no choice but to enroll in one of the "credit building solutions" offered in the letters in order to repair its credit and the false information reported on its D&B profile.  So it purchased a CreditBuilder product for $39.99 per month for the period of one year.

49.     On April 9, 2012, DMC learned that D&B had published on its credit report that DMC had failed to pay a bill of $2,500.  This information was false and inaccurate.  DMC never had any such unpaid bill.  After learning of this, Ms. Thompson spoke with D&B representative Pam Boughan, who refused to disclose the identity of the supplier who allegedly reported the negative payment experience, and stated that DMC must submit a re-check procedure on the trade experience in order to dispute the record.

50.     On or about April 21, 2012, DMC received an alert which indicated that DMC's SER Rating had risen from a 6 to a 7, and that DMC's Financial Stress score had risen from a 3

to a 4.  There was no basis for the changes because there had been no material changes in the manner in which DMC conducted business.

51.     On August 8, 2012, DMC received several emails stating that D&B had verified negative payment experiences reported on DMC's record which indicated that DMC was slow in making its payments.  However, no such experiences actually occurred or were reported and DMC had always made timely payments to vendors.

52.     On September 21, 2012, DMC again received an email alert which indicated that there was a new inquiry into DMC's record with D&B.  However, no such inquiry ever took place.

53.     Prior to purchasing CreditBuilder, DMC attempted to refinance its line of credit with its lender, however, the lender refused.  The lender's refusal to refinance the line of credit was due, in whole or in part, to the false and inaccurate information and faulty scores and ratings placed on DMC's D&B credit report.

## CLASS ALLEGATIONS

54.     This action is brought on behalf of the named plaintiff as well as on behalf of the following class members ("Class Members" or the "Class"), pursuant to Federal Rule of Civil Procedure 23(b)(2)-(3):

> **All purchasers of a CreditBuilder product in the United States or in such state(s) as this Court may certify**.

55.     The number of Class Members is so numerous and geographically diverse that their joinder is impracticable.  There are thousands of small businesses across the country and within the state of Ohio that meet the Class definition.

56.     The questions of law and fact arising from the named plaintiff's claims are questions common to each member of the Class, and these common questions predominate over any individual questions.  These common questions include the following:

(a) Did DBCC's representations or omissions create a likelihood of confusion about the affiliation between itself and CreditBuilder with D&B?

12

(b) Were DBCC's representations or omissions about itself, D&B, and CreditBuilder misleading to potential customers, and, if so, was it objectively reasonable to rely on those representations or omissions when a potential customer decided whether to purchase CreditBuilder?

(c) Did D&B institute a process by which false information was placed on small business credit reports?

(d) Is the publication of false credit information by D&B defamatory?

(e) Did D&B breach a duty to report accurate, current, and truthful information owed to small businesses? and

(f) How does negative information on a small business's credit report impact access to credit?

57.     The named plaintiff's claims are typical of those of the Class Members.  And the named plaintiff will fairly and adequately protect the interests of the Class, and has retained experienced counsel to do so.

58.     This case can easily be managed as a class action because the defendants keep electronic databases containing data about each Class Member, which are readily searchable. Notice can be sent to virtually every Class Member by their DUNS number.

59.     Given that the damage to individual Class Members would likely be dwarfed by the expense of litigating a claim on an individual basis, a class action is the most efficient way to adjudicate this matter.

60.     In addition, a Class may be certified because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or (c) defendants have acted or refused to act

on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION

### DECEPTIVE TRADE PRACTICES
### CLAIM AGAINST DBCC

61.     This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against DBCC only.  This cause of action is brought under Ohio's Deceptive Trade Practices Act (the "Act"), R.C. 4165.01, *et seq.*

62.     Under the Act, DBCC is a "person" engaged in a course of business, and the Plaintiff and Class Members are each "persons" likely to be damaged by deceptive trade practices associated with the marketing and sale of CreditBuilder.

63.     DBCC's marketing, solicitations, and other representations regarding itself, D&B, and CreditBuilder constitute deceptive trade practices under the Act, including: (a) passing off goods or services as those of another; (b) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (c) causing a likelihood of confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another; and (d) representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

64.     DBCC engaged in these deceptive acts willfully.

## SECOND CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION & CONCEALMENT
### CLAIM AGAINST DBCC

65.     This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against DBCC only.

66.     DBCC knew or should have known that its representations about itself, D&B, and CreditBuilder were likely to mislead members of the Class.

67.     DBCC knew or should have known that its failures to disclose material information about itself, D&B, and CreditBuilder were likely to mislead members of the Class.

68.     Class Members reasonably relied on DBCC's misrepresentations or concealments in deciding whether to purchase CreditBuilder.

69.     As a direct and proximate result of DBCC's negligent misrepresentation and concealment, Plaintiff and Class Members sustained damages, including money spent purchasing CreditBuilder.

## THIRD CAUSE OF ACTION

### DECEPTIVE TRADE PRACTICES
### CLAIM AGAINST D&B

70.     This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against D&B only.  This cause of action is brought under the Act.

71.     Under the Act, D&B is a "person" engaged in a course of business, and the Plaintiff and Class Members are each "persons" likely to be damaged by deceptive trade practices associated with D&B's entering of false information on credit reports, which is designed to promote sales of CreditBuilder.

72.     D&B's entering of false information on credit reports constitutes a deceptive trade practice under the Act, including disparaging the business of another by false representation of fact.

73.     D&B's disparagements were made willfully.

## FOURTH CAUSE OF ACTION

### DEFAMATION
### CLAIM AGAINST D&B

74.     This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against D&B only.

15

75.    D&B published to third persons false and defamatory matters about the Plaintiff and Class Members.

76.    These publications were unprivileged, or they were made with actual malice.

77.    These publications were defamatory *per se* in that they contained negative information about the Plaintiff's and Class Members' businesses and creditworthiness.

78.    As a direct and proximate result of D&B's defamation, the Plaintiff and Class Members suffered damages, including general (presumed) damages and actual damages (*e.g.*, loss of credit opportunities).

79.    As a further direct and proximate result of D&B's defamation, the Plaintiff and each Class Member purchased CreditBuilder in order to address the false and defamatory information on their credit reports; therefore, each member of the Class incurred the same special damage: the cost of CreditBuilder.

80.    Given D&B's actual malice, the imposition of punitive damages is warranted.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE
### CLAIM AGAINST D&B

81.    This cause of action incorporates all of the allegations in the other parts of this complaint.  This cause of action is brought against D&B only.

82.    D&B owes a duty to those small businesses upon whom it chooses to report to take reasonable steps to verify the accuracy and timeliness of information D&B places on its credit reports and which is used by D&B to give ratings and scores.

83.    D&B breached this duty by failing to undertake reasonable steps in verifying the accuracy and timeliness of information placed on reports and used to give ratings and scores.

84.    As a direct and proximate result of D&B's negligence, Plaintiff and Class members have sustained damages, including money spent purchasing CreditBuilder to attempt to remedy the inaccurate and untimely information.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against each defendant, including:

A.      Certifying this action as a Class Action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.      An injunction ordering DBCC to fully disclose the nature of its relationship to D&B in all marketing literature, sales calls, and other forms of solicitation;

C.      An injunction ordering D&B to fully disclose to each Class Member the identities of each person or entity that purportedly made an inquiry or report to D&B regarding that Class Member and upon which D&B relied in publishing its credit reports and ratings;

D.      Actual damages in amounts to be proven at the trial of this matter;

E.      Attorneys' fees and costs;

F.      Punitive damages; and

G.      Pre- and post-judgment interest, as appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted

s/Jack Landskroner
_____
Jack Landskroner (0059227)
Drew Legando (0084209)
**LANDSKRONER GRIECO MERRIMAN, LLC**
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. jack@lgmlegal.com, drew@lgmlegal.com

Christopher Collins
Frank Janecek
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, California  92101-3301
T. (619) 231-1058
F. (619) 231-7423
E. chrisc@rgrdlaw.com, frankj@rgrdlaw.com

Stuart A. Davidson
ROBBINS GELLER RUDMAN
   & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida  33432
T. (561) 750-3000
F. (561) 750-3364
E. sdavidson@rgrdlaw.com

Ross E. Shanberg
SHANBERG, STAFFORD & BARTZ LLP
19200 Von Karman Avenue, Suite 400
Irvine, California  92612
T. (949) 622-5444
F. (949) 622-5448
E. rshanberg@ssfirm.com

*Counsel for Plaintiff and the Class*